IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CATALYST PHARMA GROUP, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 09-391-SLR |
| | ) |
| ICON CLINICAL RESEARCH, INC., | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM ORDER**

At Wilmington this 31st day of March, 2010, having reviewed defendant's motion to dismiss or, in the alternative, to stay this action, and the papers submitted in connection therewith;

IT IS ORDERED that said motion (D.I. 4) is granted, to the extent that the instant litigation is stayed pending further order of the court, for the reasons that follow:

1. **Background.** On February 11, 2008, the parties entered into a Purchase Agreement, pursuant to which plaintiff Catalyst Pharma Group, Inc. ("Catalyst") sold its wholly owned subsidiary, HCD, to defendant ICON Clinical Research, Inc. ("ICON"). As part of the Purchase Agreement, the parties agreed that, if HCD met certain financial benchmarks during a defined "Earn-Out" period, Catalyst would receive a Contingent Payment, the calculation of which would be governed by section 2.4(a) of the Purchase Agreement. This provision states that if, during the 12-month period from January 1, 2008 through December 31, 2008, HCD's EDITDA was greater than $2.15 million,

Catalyst would be entitled to a contingent payment of between $4.75 million and $10 million. The Purchase Agreement included a detailed method for the calculation of EBITDA and imposed specific requirements on ICON to keep and maintain accounting records consistent with ICON's standard practices.

2. The Purchase Agreement further established detailed procedures for the resolution of any dispute involving the calculation of HCD's EBITDA for purposes of the Contingency Payment. Section 2.4(b) required ICON to deliver to Catalyst a comprehensive accounting and statement of EBITDA, referred to in the Purchase Agreement as the "Earn-Out Report." The Purchase Agreement required ICON to deliver the Earn-Out Report within 30 days of the end of the Earn-Out Period. The Earn-Out Report listed HCD's 2008 EBITDA as $1.52 million, more than $633,000 below the threshold $2.15 million necessary for Catalyst to receive a Contingent Payment.

3. The Purchase Agreement provided that, if Catalyst disagreed with ICON's calculation of EBITDA for purposes of the Contingent Payment, it would be required to submit an EBITDA Dispute Notice to ICON. Catalyst in fact disputed ICON's calculation of EBITDA and timely submitted its EBITDA Dispute Notice challenging, e.g., the reserves that ICON had taken for accounts receivable from a particular customer, various expense accruals, the recording of travel expense allocations, various other earn-out adjustments, and accounting of expenses related to overhead and bonuses. Section 2.4(e) further provided that, in the event Catalyst and ICON could not agree in good faith upon the amount of EBITDA for purposes of the Contingent Payment, they were required to submit their differences to an "Independent Accounting Firm" for a

"conclusive, final and binding" determination. "[T]he engagement of the Independent Accounting Firm shall be limited to reviewing the calculation of EBITDA and the Contingent Payment set forth in such Earn-Out Report."

4. Section 2.4(f) of the Purchase Agreement provided that "the right of [Catalyst] to receive the Contingent Payment does not create in [Catalyst] any right to control or direct the management and operations of [HCD]" and the Catalyst "will have no claim against [ICON] . . . and [ICON] will have no liability to [Catalyst], with respect to the management and operation of [HCD], including any impact thereof on the EBITDA of [HCD] or on the amount of any Contingent Payment." Notwithstanding the above, section 2.4(f) also prohibited ICON from taking "any action . . . in order to (i) reduce the amount of EBITDA of [HCD], (ii) delay the making of any Contingent Payment, [or] (iii) make any material change in accounting policies or practices that would reduce EBITDA . . . ."

5. Catalyst alleges in the complaint at bar, inter alia, that ICON violated section 2.4(f) by engaging in conduct similar or identical to that identified in its EBITDA Dispute Notice. ICON filed its motion to dismiss or stay based on its contention that the dispute over the proper calculation of EBITDA must be resolved by an Independent Accounting Firm, as mandated by section 2.4(e) of the Purchase Agreement. Catalyst responds by arguing that the "calculation" of EBITDA is not at issue, rather, "[a]t issue is whether ICON's actions were intended to deprive Catalyst of the benefit of the bargain agreed to in the Purchase Agreement by violating the explicit terms and implied covenants of the Purchase Agreement that prohibited ICON from sabotaging Catalyst's entitlement to a Contingent Payment." (D.I. 7 at 4)

3

6. **Analysis.** I start my analysis with the observation that section 2.4(e) of the Purchase Agreement specifically states the any dispute over the amount of the EBITDA shall be resolved by an Independent Accounting Firm "acting as an expert and not as an arbitrator." To the extent that ICON characterizes this section as an agreement to arbitrate, ICON's argument is less than compelling. However, the court agrees with ICON to the following extent: The parties agreed to have an Independent Accounting Firm resolve any "accounting issues" related to the calculation of EBITDA. It strikes me that at least some of the conduct attributed to ICON by Catalyst falls within this category; that is, regardless of intent (i.e., the allegations of fraudulent conduct), an accountant charged with calculating EBITDA (consistent with the definition of EBITDA in the Purchase Agreement) will review such matters as the appropriate allocation of overhead expenses, bringing to such issues an expertise I do not have. Rather than rely on the parties' paid experts, I believe having an independent expert is an excellent first step to resolving this litigation which, at bottom, is a dispute over the amount of the EBITDA. If the Independent Accounting Firm calculates EBITDA consistently with ICON, it may be difficult for Catalyst to prove fraudulent conduct.[1] If the Independent Accounting Firm calculates EBITDA substantially higher than ICON, not only may Catalyst be entitled to a Contingent Payment based on that higher calculation, but Catalyst may have further support for its allegations of fraudulent conduct by ICON.

7. **Conclusion.** For the reasons stated above, the matter shall be stayed

---

[1] I note, however, that if I found there to be fraudulent conduct on the part of ICON that affected the calculation of EBITDA, the determination of any Contingent Payment based on such calculation would **not** be "conclusive, final and binding on the parties."

pending a referral of the issues identified in Catalyst's EBITDA Dispute Notice to an Independent Accounting Firm.

_____
United States District Judge